TDE LTD. *et al.*, Plaintiffs-Appellees, v. ALAN ISRAEL *et al.*, Defendants-Appellants (Focus Real Estate Equities Corporation *et al.*, Defendants).

First District (2nd Division)   No. 1—88—3780

Opinion filed June 30, 1989.

1060

Margolin, Seitlin, Aronson & Blecher, of Chicago (Robert Blecher, of counsel), for appellants.

Altheimer & Gray, of Chicago (Roger B. Harris, Robert I. Berger, and Mark T. Hechinger, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

This interlocutory appeal (107 Ill. 2d R. 307(a)(1)) arises from a circuit court order denying defendants' motion to dismiss plaintiffs' lawsuit or, alternatively, to stay litigation proceedings, and to compel arbitration.[1] We are asked to determine whether the court entered its order in error and whether defendants are entitled to compel arbitration.

After filing their mechanic's lien on September 13, 1988, for labor and materials they claim to have furnished defendants, on September 27, 1988, plaintiffs TDE Ltd. and Arthur Swanson & Associates, Ltd., doing business as CD Group (collectively CD Group), filed a verified complaint to foreclose their mechanic's lien and "for other relief." The complaint alleged in its first count that CD Group acts as a general contractor in the construction of office and other buildings; defendant La Salle National Bank, as trustee for trust number 110740 (Trust), holds legal title to certain real estate and improvements located at 3210 Dundee Road in Northbrook, Illinois (Property); and defendant Dundee-Landwehr Limited Partnership, comprised of defendant Alan Israel and defendants Focus Real Estate Equities Corporation and Pilgrim Investment Group (collectively Owners), owned the beneficial interest in the Property. CD Group additionally asserted that it entered into a written agreement (Agreement) with the Trust on December 17, 1987, whereby CD Group promised to "perform *** labor and furnish *** materials at the Property for the construction of a two-story office building with an underground parking garage for the sum of $5,640,000." Subsequent change orders elevated the cost of performance to $5,686,296.

Pursuant to the Agreement, CD Group performed labor and furnished materials required of it. On July 12, 1988, CD Group submitted to the Trust a "fourth draw payment" for $866,298 which the Trust "failed and refused to pay"; the Trust similarly forwarded no payment to CD Group for its "fifth draw payment" of $568,739, tendered

---

[1]Hereinafter, motion to stay. CD Group accurately contends that the Act does not permit dismissal of judicial proceedings improperly brought before the circuit court but rather prescribes a stay of those proceedings "if an order for arbitration or an application therefor has been made." (Ill. Rev. Stat. 1987, ch. 10, par. 102(d).) The Owners agree, since they request, in their briefs and notice of appeal, only a stay of judicial proceedings and an order compelling arbitration.

August 24, 1988. CD Group also alleged that the Trust holds additional sums of $196,666 as "retainage under the five draw requests" and $461,998 for labor and materials furnished after submission of the fifth draw request. The total outstanding balance owed by the Trust as of September 12, 1988, equalled $2,093,703. Counts II and III of the verified complaint sought damages for breach of contract and *quantum meruit.*

CD Group moved for appointment of a receiver for the Property on October 11, 1988, declaring that CD Group and subcontractors participating in the project removed their personnel and equipment from the Property after the Owners[2] failed to honor CD Group's requests for payment, and alleging that the unfinished structure was exposed to deterioration by the elements or destruction by municipal authorities as an attractive nuisance.

The Owners responded to the motion on October 27, 1988, objecting to CD Group's demand for establishment of an expedited trial schedule and waiver of CD Group's obligation to post a bond. The Owners did not object to appointment of a receiver, provided that corporations furnishing the Owners with a construction loan, defendants Focus Real Estate Finance Company and National Canada Corporation (collectively Lenders), agreed to fund continued construction at the Property. The Owners specifically declared that their consent to appointment of a receiver was not meant to be construed as a waiver of any other rights they may have with respect to the receiver's appointment. The circuit court appointed a receiver on November 4, 1988.

On November 3, 1988, the Owners responded to CD Group's complaint with their motion for dismissal or stay. Citing specific provisions of the Agreement, the Owners asserted that filing the complaint without first submitting the matter to arbitration clearly violated the Agreement and requested that the court compel arbitration. On November 2, 1988, the Trust answered CD Group's complaint.

CD Group filed a response on November 15, 1988, to which the Owners replied on November 28, 1988.

By order entered November 29, 1988, the circuit court denied the Owners' motion.

On December 28, 1988, the Owners filed a notice of interlocutory

---

[2]CD Group named the Trust and the Owners as defendants in all pleadings filed in the instant case; however, CD Group sought judgment against the Trust in its complaint and then, in all subsequent pleadings, identified the Owners as the breaching party.

appeal (107 Ill. 2d R. 307(a)(1)), seeking to compel arbitration and to stay all judicial proceedings pending the outcome of the arbitration.

## I

### A

The Owners insist the circuit court erred in denying their motion where the claims articulated in CD Group's complaint fell squarely within the arbitration provision in the Agreement, which states in part:

> "7.9.1 All claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or breach thereof *** shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise *** ."

Parties who execute a contract containing a valid arbitration clause are irrevocably committed to arbitrate all disputes clearly arising under the agreement. (*Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr* (1988), 124 Ill. 2d 435, 445, 530 N.E.2d 439; *First Condominium Development Co. v. Apex Construction & Engineering Corp.* (1984), 126 Ill. App. 3d 843, 846, 467 N.E.2d 932.) If the subject litigation apparently falls outside the ambit of the arbitration provision, the court may dispose of the question in favor of the opposing party, because no agreement to arbitrate exists. (*Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d at 445.) If, however, the subject clause is broadly phrased and its scope unclear, the court must direct the initial question of arbitrability to the arbitrator, subject to judicial review. *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d at 447-48; *Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 1051, 331 N.E.2d 835.

In the case *sub judice*, CD Group filed its complaint to recover payments allegedly due under the express terms of the Agreement, a scenario plainly anticipated by the comprehensive phrasing of the arbitration clause or at the very least, raising a reasonable doubt of arbitrability, which would also require submission of the issue to the arbitrator. *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d at 447; *Diersen v. Joe Keim Builders, Inc.* (1987), 153 Ill. App. 3d 373, 376, 505 N.E.2d 1325.

CD Group responds that no dispute exists between itself and the

Owners and argues that, under the terms of the construction loan agreement executed by the Owners and the Lenders, the Owners receive all money necessary to pay CD Group from the Lenders. The Lenders remitted to the Owners funds sufficient to satisfy the first three draw requests from CD Group, but then refused to provide adequate amounts to meet the fourth and fifth draw requests and all subsequent demands for money. Citing pleadings purportedly filed in a separate action between the Owners and the Lenders, but, as will be later noted are *dehors* the record, CD Group urges that the Owners admitted both their indebtedness to CD Group under the contract terms and that, but for the Lenders' refusal to supply funds under the construction loan agreement, those sums would be paid. CD Group therefore concludes that no controversy or dispute exists between it and the Owners, removing their complaint from the authority of the arbitration clause. See Ill. Rev. Stat. 1987, ch. 10, par. 101.

██ ▮ Some decisions support the proposition that arbitration presumes an identifiable conflict between the parties (*Sebree v. Board of Education* (1912), 254 Ill. 438, 446, 98 N.E. 931; *Norton v. Gale* (1880), 95 Ill. 533, 542-43); nevertheless, these cases express common law principles prevailing prior to the adoption in Illinois of the Uniform Arbitration Act (Act) (see *J & K Cement Construction, Inc. v. Montalbano Builders, Inc.* (1983), 119 Ill. App. 3d 663, 667, 456 N.E.2d 889; Ill. Rev. Stat. 1987, ch. 10, par. 101 *et seq.*), which defines the contours of the instant appeal. The Act explicitly directs the circuit court to determine "summarily" the question of arbitrability (Ill. Rev. Stat. 1987, ch. 10, par. 102(a)), and bars the court from refusing arbitration "on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown." (Ill. Rev. Stat. 1987, ch. 10, par. 102(e).) The sole issue at preliminary hearings to compel or stay arbitration is whether there is an agreement to arbitrate: if so, the court should order arbitration; if not, arbitration should be refused. (*Geldermann, Inc. v. Mullins* (1988), 171 Ill. App. 3d 255, 258, 524 N.E.2d 1212; *School District No. 46 v. Del Bianco* (1966), 68 Ill. App. 2d 145, 156, 215 N.E.2d 25.) Any venture by the circuit court into the merits of the claim underlying the dispute is improper. *Geldermann, Inc. v. Mullins*, 171 Ill. App. 3d at 258; *Bunge Corp. v. Williams* (1977), 45 Ill. App. 3d 359, 363, 359 N.E.2d 844.

The Owners correctly observe that the documents filed in the Owners-Lenders dispute are not in the record on appeal and therefore lie beyond the purview of this court. (*Okumura v. Niesei Bow-*

*lium, Inc.* (1976), 43 Ill. App. 3d 753, 755, 357 N.E.2d 187.) CD Group maintains that its attorney read aloud to the court portions of the Owners' complaint against the Lenders, in which the Owners demanded certain sums of money from the Lenders for their alleged breach of the construction loan agreement; nevertheless, counsel never tendered these documents to the court, nor did he ever articulate any allegations in which the Owners admitted they owed these same funds to CD Group. Additionally, the mere recitation of line items in the Owners' draw requests submitted to the Lenders reflecting amounts allegedly owed to CD Group does not negate the possibility of a dispute between the parties at bar.

CD Group's attorney further insisted that the Owners conceded, in the complaint against the Lenders, a debt to CD Group for the amounts of the fourth and fifth draw requests. Neither the alleged admissions nor the remaining contents of the pleadings, however, were read into the transcript. Absent inclusion in the record of the documents themselves, or at least a full disclosure of the statements contained therein, this court cannot render a decision which takes these pleadings into account. See *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 645, 432 N.E.2d 1267.

■ No evidence of record indicates a lack of contention between the parties. The Owners' motion was the only document filed in response to CD Group's complaint; the Owners did not answer the complaint, and they have yet to exhaust discovery available to them. Moreover, the Owners insisted in their reply to CD Group's response to their motion that "[w]hile [the Owners] do not dispute that [CD Group] may be entitled to some relief in this case, [the Owners] have never admitted, and do not admit, that [CD Group is] entitled to the relief prayed for in [its] complaint."

Cases cited by CD Group to restrict application of the instant arbitration clause do not persuade. In *Geldermann, Inc. v. Mullins*, 171 Ill. App. 3d 255, and *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, the arbitration provisions construed were, by their terms, much narrower in scope than the passage at issue here. In *Diersen v. Joe Keim Builders, Inc.*, 153 Ill. App. 3d at 376, furthermore, the court interpreted a broadly phrased, "generic" arbitration provision, similar to the one at bar, and ruled that the circuit court properly stayed judicial proceedings and compelled arbitration of an alleged breach of a construction contract.

## B

■ CD Group next insists the circuit court correctly denied the

motion to dismiss because the Owners neglected to file with CD Group, the architect and the proper arbitration authority a formal demand for arbitration as required by the Agreement. Section 7.9.2 of the Agreement states:

> "Notice of the demand for arbitration shall be filed in writing with the other party to the Owner-Contractor Agreement and with the American Arbitration Association, and a copy shall be filed with the Architect ***."

The Act, however, requires only the following proof to compel arbitration: (a) an agreement between the parties to arbitrate; and (b) refusal by the opposing party to comply with that agreement. The court then "shall order the parties to proceed with arbitration." Ill. Rev. Stat. 1987, ch. 10, par. 102(a).

In this case, the parties' consent to arbitration has already been established. The fact CD Group filed the complaint and resisted subsequent attempts to compel arbitration sufficiently demonstrates CD Group's refusal to honor the Agreement's terms.

■ Furthermore, a demand for arbitration merely provides notice of the nature of the dispute and allows parties to comply with their arbitration agreement before the commencement of litigation. (See *Associated Milk Dealers, Inc. v. Milk Drivers Union Local 753* (7th Cir. 1970), 422 F.2d 546, 554.) As initiators of the present litigation, CD Group "noticed" itself of the nature of its own claims. Filing the complaint illustrated that CD Group has already decided to forego arbitration in favor of judicial proceedings.

Other notice provisions allegedly breached by the Owners are inapplicable to the case at bar. Section 7.9.4(i) of the Agreement, for instance, requires:

> "Promptly upon the filing of the arbitration each party shall be required to set forth in writing and to serve upon each other party a detailed statement of its contentions of fact and law."

When "the filing of the arbitration" occurs is unclear; the sentence as a whole, read in the context of the entire section, governs the parties' conduct *once the court orders arbitration to begin.* Section 7.9.4(ii) makes the arbitration proceeding subject to provisions of the Illinois Code of Civil Procedure and the Illinois Supreme Court Rules governing discovery; section 7.9.4(iii) prescribes swift initiation of arbitration *once ordered*; and section 7.9.4(iv) states "[t]hese *** rules shall be implemented and applied by the arbitrator."

■ The Owners' failure to issue a formal demand for arbitration did not wrongfully deny CD Group severability of issues. The Own-

ers' motion made plain their desire to compel arbitration, yet CD Group advances no explanation as to why it could not, at that time, articulate an argument in the alternative, requesting severability of issues. The mere fact this appeal reflects only a fraction of the multiparty claims spawned by the construction project does not necessarily militate against severance of issues raised below. (*J & K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d at 679.) The circuit court therefore erred in refusing to stay judicial proceedings initiated by CD Group and to compel arbitration.

## II

The Owners assert that they have not waived their right to activate the Agreement's arbitration mechanism by responding to and participating in hearings conducted pursuant to CD Group's motion to appoint a receiver. Already noted above is the Owner's declaration that no waiver of any other rights aside from the appointment of a receiver was intended. CD Group does not respond to this contention in its brief. Nevertheless, we elect to consider this point on its merits. See *Marcus v. Green* (1973), 13 Ill. App. 3d 699, 710, 300 N.E.2d 512.

■ Waiver of a contractual right to arbitration occurs when a party's conduct is so inconsistent with the arbitration clause as to demonstrate abandonment of that right (*Kostakos v. KSN Joint Venture No. 1* (1986), 142 Ill. App. 3d 533, 536, 491 N.E.2d 1322; *Atlas v. 7101 Partnership* (1982), 109 Ill. App. 3d 236, 240, 440 N.E.2d 381; *Brennan v. Kenwick* (1981), 97 Ill. App. 3d 1040, 1042, 425 N.E.2d 439), *i.e.*, when the party admits an arbitration agreement exists yet submits to a court for decision issues arbitrable under the contract terms. (*Brennan v. Kenwick*, 97 Ill. App. 3d at 1042.) Illinois courts do not favor waiver of the right to arbitrate. *Kostakos v. KSN Joint Venture No. 1*, 142 Ill. App. 3d at 536.

■ Here, the Owners' sole and immediate response to CD Group's complaint was their motion to stay and to compel arbitration, and their reply to CD Group's response. The motion was grounded only in the theory that CD Group's claim properly belonged before an arbitrator; the Owners asserted no affirmative defenses nor did they request that the court rule on any substantive questions. Moreover, the Owners reacted with sufficient speed to CD Group's assertion of a breach of contract that no legitimate argument of prejudice to CD Group can be made. See *Kostakos v. KSN Joint Venture No. 1*, 142 Ill. App. 3d at 537.

The Owners' reaction to CD Group's complaint seeking appoint-

ment of a receiver was limited to responsive pleadings and court appearances to protect their rights in litigation being pursued by CD Group and present their position to the court. Significantly, among the reasons given by CD Group for the appointment of a receiver was the potential involvement by local authorities to abate what they might consider a public nuisance in the form of an abandoned, incomplete building. This issue transcended the individual rights of the parties and became, in part, a matter of public interest to which the Owners were obligated to respond as lying beyond the parameters of arbitration exclusivity. (See, *e.g., Applied Digital Technology, Inc. v. Continental Casualty Co.* (7th Cir. 1978), 576 F.2d 116, 117. See also *Edward Electric Co. v. Automation, Inc.* (1987), 164 Ill. App. 3d 547, 554-55, 518 N.E.2d 172.) Neither party contends that the arbitrator was empowered to appoint a receiver for the property pending arbitration. This issue was solely within the circuit court's authority; it was not interrelated or intertwined with the issues subject to arbitration, and was severable under section 2(d) of the Act. (Ill. Rev. Stat. 1987, ch. 10, par. 102(d).) This reaffirms our conclusion that no waiver occurred.

### III

The Owners urge that the presence of subcontractors' claims in the instant litigation should not preclude enforcement of the agreement to arbitrate under section 7.9.1 of the Agreement. CD Group does not respond to this argument in its brief; nevertheless, we will dispose of it here. See *Marcus v. Green*, 13 Ill. App. 3d at 710.

Section 2(a) of the Act enumerates the bare events which trigger the parties' obligation to arbitrate, namely, an agreement to arbitrate and a refusal by the party opposing arbitration to do so. (Ill. Rev. Stat. 1987, ch. 10, par. 102(a).) As demonstrated above, these factors are present in the case at bar.

Nowhere in the Agreement, moreover, do the parties condition arbitration with consideration of "judicial economy," one of the grounds upon which CD Group apparently opposed arbitration below. The Agreement states simply and directly that "all claims, disputes and other matters" engendered by the Agreement or a breach thereof must be submitted to the arbitrator. Furthermore, this court has already rejected "judicial economy" as a bar to enforcing a valid arbitration agreement. (See, *e.g., J & K Cement Construction, Inc. v. Montalbano Builders, Inc.*, 119 Ill. App. 3d at 676; *Kostakos v. KSN Joint Venture No. 1*, 142 Ill. App. 3d at 538.) The parties, therefore, must adhere to the terms of the Agreement and submit their dispute

to arbitration.

For the reasons stated herein, we reverse with directions to submit the matters at issue for arbitration and to stay further litigation except such matters involving the receivership as may arise.

Judgment reversed and remanded with directions.

BILANDIC, P.J., and DiVITO, J., concur.